**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**Kathleen O' Connor and Julie Tossey,**

**Plaintiffs,**

**v.**

**City of St. Paul; Timothy K. Fuller; Gary Olding; Patrick Smith; and Chris Cook,**

**Defendants.**

**Civil No. 01-846 (MJD/SRN)**

**REPORT AND RECOMMENDATION**

---

Daniel John Boivin, Esq. and Sandra K. Kensy, Esq., on behalf of Plaintiffs.

Peter G. Mikhail, Esq., Frank E. Villaume III, Esq., and John H. Guthmann, Esq., on behalf of Defendants.

---

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-entitled matter came before the undersigned United States Magistrate Judge on April 4, 2003, on Defendants City of St. Paul, Fuller, and Cook's Motion for Summary Judgment (Doc. Nos. 56 & 59), Defendants City of St. Paul, Fuller, Cook, and Olding's Motion to Strike Portions of Plaintiff's Submissions (Doc. No. 76), Defendant Olding's Motion for Summary Judgment (Doc. No. 66), and Plaintiffs' Motion to Strike Portions of Affidavits (Doc. Nos. 69-1, 85-1, & 85-2). Both motions to strike were considered on the papers. These motions have been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636 and Local Rule 72.1(c).

For the reasons set forth below, this Court recommends that: (1) Defendants City of St. Paul, Fuller, and Cook's motion for summary judgment be granted in part and denied in part; (2)

FILED JUL 23 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

Defendant Olding's motion for summary judgment be granted; (3) Defendants' motion to strike portions of Plaintiffs' submissions be denied as moot in part and denied in part; and (4) Plaintiffs' motion to strike portions of affidavits be denied as moot in part and denied in part.

## I. BACKGROUND

The Amended Complaint in the present case includes the following Counts: (1) unlawful sex discrimination, disparate treatment, in violation of 42 U.S.C. § 2000e et seq. and Minn. Stat. § 363.01 et seq.; (2) deprivation of equal protection of the laws in violation of 42 U.S.C. § 1983; (3) deprivation of right to due process of law in violation of 42 U.S.C. § 1983; (4) age discrimination in violation of 29 U.S.C. § 621 et seq. and Minn. Stat § 363.01 et seq.; (5) conspiracy in violation of 42 U.S.C. § 1985; (6) retaliation/reprisal in violation of 42 U.S.C. § 2000e et seq. and Minn. Stat. § 363.01, subd. 7; (7) hostile work environment in violation of 42 U.S.C. § 2000e et seq.; (8) intentional infliction of emotional distress; (9) aiding and abetting in violation of Minn. Stat. § 363.01, subd. 6; (10) agency; (11) vicarious liability/respondeat superior; and (12) tortious interference with contractual relations. These Counts all arise from Plaintiffs' participation in and termination from the St. Paul Fire Department (SPFD)'s twelve-week 2000 Recruit Academy (Academy).

### A. Initial Application and Entrance Examinations for the 2000 Recruit Academy.

On May 17, 1999, the City of St. Paul announced that it intended to hire firefighters from those individuals who passed a written exam that would be given August 6, 1999, and a physical performance test. (Affidavit of Mark Robertson (Robertson Aff.); Ex. F.) The firefighter application form included a line asking if the applicant was currently a fire alarm dispatcher with

the City of St. Paul. (Transmittal Affidavit of Daniel J. Boivin (Boivin Aff.); Ex. 41.) Seven fire dispatchers, six female, including O'Connor and Tossey, and one male submitted applications. (Amended Complaint ¶ 30.)

The male dispatcher failed the written examination and Tossey stated in her affidavit that she believed one female dispatcher also failed. (Affidavit of Julie Tossey (Tossey Aff.) ¶ 5.) One female dispatcher chose not to take the physical entrance exam given in October, while the four remaining female dispatchers took the exam. Id. at ¶ 6. The test was administered with a mannequin that weighed the same amount but had a larger chest than the mannequins used in previous entrance tests, and all four female dispatchers failed. Id. In response to protests, St. Paul offered a retest on May 15-17, 2000 which included a mannequin which weighed the same 175 lbs., but was seven inches shorter and had an eight-inch smaller chest circumference . (Boivin Aff.; Ex. 35.) Human Resources Director John Hamilton was not involved in deciding to offer a retest, and only became aware a retest was being offered when he saw Mayor Coleman's press conference announcing that fact. (Deposition of John Hamilton (Hamilton Depo.) at 8.) O'Connor and Tossey were the only dispatchers who passed the second test. (Tossey Aff.; ¶ 6.) The other dispatchers filed a charge of discrimination with the Minnesota Department of Human Rights (MDHR). (Hamilton Depo. at 10.) In response, the MDHR determined that probable cause existed to credit the allegations of unfair discriminatory practice. (Boivin Aff. Ex. 38.)

**B. Seniority, Promotional Preference, and Consolidation of City Departments.**

Since 1917 there has been an absolute promotional preference afforded to city employees. (Deposition of Mark Robertson (Robertson Depo.) at 17-18.) Individuals who meet the criteria

established in the civil service rules are entitled to be appointed to classified positions ahead of those without promotional preference, as long they pass a particular civil service examination. Id. Only sworn employees in the police and fire departments have promotional preference within those departments. Id. at 19-20. In the early 1990s, police dispatchers were sworn employees but fire dispatchers were not. Id. At that time, in order to increase the potential number of female firefighters, Acting Fire Chief John Colonna initiated a lobbying effort to have fire dispatchers made part of a sworn unit as well. Id. at 19-21. As a result of the lobbying, it became a departmental practice to swear in fire dispatchers and the job specifications were also altered administratively to reflect that fire dispatchers were sworn employees. Id. at 22.

On August 16, 1998, St. Paul Mayor Norm Coleman proposed consolidating the police and fire emergency communication centers. (Deposition of John P. Colonna (Colonna Depo.) at 62-63.) Similar proposals had been argued back and forth during the preceding ten years. Id. The merger was consistently opposed by Gary Olding in his capacity as president of the firefighter's union, Local 21. (Deposition of Gary Olding (Olding Depo.) at 30-32.) At the time of Mayor Coleman's proposal, however, the union recognized it did not have the votes to stop the merger. Id. at 33. On July 14, 1999, the St. Paul City Council approved the merger. (Amended Complaint ¶ 34; Affidavit of Frank E. Villaume III (Villaume Aff.); Ex. 6: C.F. File No. 99-680.) On July 21, 1999, the resolution was unanimously amended to delete the section which provided that "the transfer will not affect the promotion rights of fire and safety service communications center personnel for the current fire fighter testing process." Id. The merger had the effect of making the former fire dispatchers employees of the St. Paul Police Department. On January 18, 2000, the dispatchers were no longer members of Local 21, and became members

of the Police Federation bargaining unit. (Affidavit of John H. Guthmann (Guthmann Aff.); Ex. D: Bureau of Mediation Services Unit Clarification Order.)

As a result of the amended resolution, six female dispatchers from the communication center contacted councilmembers concerned about whether they would retain promotional rights when applying for positions as firefighters. (Hamilton Depo. at 21-22.) These dispatchers were informed by Mayor Coleman and Human Resources Specialist Lisa McKeown that their promotional rights were intact because they would be employees of the Fire Department when the written exam was given on August 6, 1999. (Deposition of Julie A. Tossey {Tossey Depo.) Vol. 1 at 114-115; Hamilton Depo.; Ex. 1; Robertson Depo.; Ex. 1.) Fire Chief Timothy Fuller disagreed with this interpretation of the governing rule. (Deposition of Timothy K. Fuller (Fuller Depo.) at 46 and 53-64.) He believed that when the dispatchers were transferred to the Police Department they should no longer have promotional preference, and that all recruits should receive the same pay until successful completion of the Academy and the apprenticeship program. Id. At some time while Tossey was a recruit, Ed Tossey recalled Fuller telling him that if Tossey accepted the job she was going to lose approximately $10,000 per year in salary. (Deposition of Ed Tossey (Ed Tossey Depo.) at 169.) Fuller does not recall having said this to Ed Tossey. (Fuller Depo. at 59.) Ed Tossey also recalls hearing a conversation in September 2000 between Olding and two other fire department employees during which someone said they should go out to the Academy and videotape 'these women' for 'a good laugh' and in which Olding added that they could show the videotape 'at the lawsuit.'" (Ed Tossey Depo. at 107.) O'Connor also recalls being told by Acting Local 21 President Stan Blum that if she did not voluntarily waive her seniority rights, the union would sue to have the promotional rights taken

away. (O'Connor Depo. Vol. II at 312-13.)

From as early as 1995 or 1996, Fuller had proposed that all firefighter recruits be paid the same salary regardless of their prior experience and conform with Minnesota Department of Labor's Joint Apprenticeship Training Program (JATP). (Fuller Depo. at 57; Hamilton Depo. at 26-27.) This was also the position of Local 21 shortly before the 2000 Academy. (Olding Depo. at 43-44.) June 27 & 28, 2000 minutes indicate Local 21 had voted to oppose the granting of seniority to new hires of any current employees. (Boivin Aff.; Ex. 36.) In August of 1999, Hamilton prepared a resolution to amend Civil Service Rule 28.B.5 to set the salary for all entry level firefighters in accordance with the JATP. (Fuller Depo.; Ex. 6.) In response, the six female dispatchers protested to Hamilton stating that the resolution was intended to reduce their pay and discourage them from becoming firefighters. (Hamilton Depo; Ex. 2.) In addition, the dispatchers pointed out that in 1994, three male dispatchers passed the firefighter exam and were promoted while maintaining the pay and seniority they had at the time. Id. Hamilton then pulled the resolution from the City Council agenda, stating that he had not intended to affect current applicants despite Fuller's position that the resolution should have been implemented immediately. Id. Finally, Hamilton submitted a compromising substitute resolution that explicitly excluded the dispatchers who had promotional preference in the 1999 entrance test. (Fuller Depo. at 79; Villaume Aff. Ex. 7: C.F. File No. 99-806.)

The dispatcher's seniority was a very controversial issue at the time in Local 21 meetings. (Deposition of Patrick Flanagan (Flanagan Depo.) at 68-69.) It was also discussed by union members in the various fire houses and at the executive board level. (Deposition of Patrick Smith (Smith Depo.) at 46-47.) Training Officer Patrick Flanagan had heard "through the

grapevine" that it would not matter how the union voted on the issue of the dispatcher's seniority, because the dispatchers would be "washed out" of the Academy by people detailed to training. (Flanagan Depo. at 69-70 & 78.) He stated that it was commonly discussed at union meetings and amongst union members that O'Connor and Tossey would be "washed out." Id. At some time after the Academy had begun, Tossey's husband, Ed Tossey, had a conversation with Fuller during which Fuller told him, while grinning, that O'Connor and Tossey still had to pass the tests, and then walked away. (Ed Tossey Depo. at 167-68.) Ed Tossey took this to mean that the fire department was going to cheat and the Academy had no intention of allowing either O'Connor or Tossey to become firefighters. Id. O'Connor recalled being told by dispatchers and firefighters that the staff for the 2000 Academy had been handpicked to ensure she would not pass. (O'Connor Depo. Vol. II at 232.) In addition, she was told by a firefighter named Fawn that Captain Chris Cook had been assigned to the Academy in order to get rid of her. Id. Gary Holmgren, a former employee of the St. Paul Fire Department recalled attending a June 27 or 28, 2000 Local 21 meeting, and while Olding did not attend the meeting, he was present afterwards at a bar upstairs. (Affidavit of Gary M. Holmgren (Holmgren Aff.) ¶ 4.) Holmgren remembered Olding being asked by firefighters about the dispatchers and replying, "Don't worry about the women being on top of the list because we will make sure they will never get through training. We control the training. We'll be able to wash them out." Id.

When the three male dispatchers became firefighters in 1994, their seniority was determined from their original dates of hire, giving them seniority over firefighters who were hired in the interim. (Smith Depo. at 41.) On June 27, 2000, Local 21 passed a resolution opposing the granting of seniority to new hirees. (Smith Depo. at 47 & 59-60.) Article 10 of the

2000-2001 Agreement between the City of St. Paul and Local 21 states that "[f]or the purposes of this Agreement department seniority shall be defined as the length of continuous and uninterrupted employment in the fire department." (Villaume Aff.; Ex. 8.) Chief Fuller did not discuss the seniority issue with Local 21, and first learned of it during his call from Tossey's husband. (Fuller Depo. at 152-53.) Captain Christopher Cook had heard about the issue of the dispatchers' seniority rights but was not concerned that it would affect him, he also did not attend any of the Local 21 meetings during which it was discussed. (Deposition of Christopher Cook (Cook Depo.) at 79-81.)

### C. Assembling the 2000 Recruit Academy Staff.

In May 2000, Chief Fuller announced Olding's promotion to one of his three Assistant Chiefs, effective June 1, 2000. As a result, Olding resigned from Local 21 and from his position as President. Fuller assigned Olding responsibilities including oversight of training activities, including the recruit academy. Olding supervised Training Chief Clarence Hawkins and appointed the recruit academy training officers. (Guthmann Aff.; Ex. G: October 3, 2000 letter to Kathleen O'Connor.) Only one of the five training officers Olding selected for the Academy had previous experience training. (Deposition of Tom McDonough (McDonough Depo.) at 19.) Another training officer recalled the makeup of the Academy as follows: "[t]he way I saw it was they gave us a mix. We ended up with an experienced truck captain. We ended up with an experienced medic engine captain. We ended up with two experienced squad captains. And then Stacy [Hohertz] was an FEO [firefighter equipment operator], and I figured that would help to make the mix a little more diverse." Id.

O'Connor had heard "through the grapevine" that Hohertz and Smith, were lovers at the

time. (O'Connor Depo. Vol. II at 339.) Prior to the 2000 Academy, Hohertz was aware that the issue of O'Connor and Tossey's seniority was controversial. (Deposition of Stacy Hohertz (Hohertz Depo.) at 33-34.) She heard no discussions between the training officers, however, concerning O'Connor and Tossey's seniority. Id. Smith was Secretary of Local 21 at that time, while the issue of the dispatchers' seniority was being debated. Id. at 9 & 56-60. He had previously worked to defend an earlier entrance examination that was challenged in 1990. Id. at 14-20. Although Hohertz told Smith generally about what the 2000 Academy was like, he did not recall having discussions with her about O'Connor and Tossey. Id. at 54-55. He had heard from someone other than Hohertz, however, that she had been assigned to mentor O'Connor. Id.

Olding had no operational role during the 2000 Academy and never instructed, directed, or otherwise influenced any of the staff to alter training or testing conditions with respect to O'Connor, Tossey, or any other recruits. (Olding Depo. at 82-84; Cook Depo. at 78-79; Hawkins Depo. at 49-51; McDonough Depo. at 81-82; Deposition of Stacy Hohertz (Hohertz Depo.) at 28-29 & 34.) During the meeting Olding attended, he discussed each recruit and his or her background. (Hawkins Depo. at 42-43; Cook Depo. at 90-91.) Neither O'Connor nor Tossey were discussed in a different manner from the rest of the recruits. Id.

Olding did not participate in the training or testing of any of the recruits. (Tossey Depo. Vol. IV at 26-28.) Olding delivered one speech to all the recruits during which he stressed that the fire service is a public safety service, and they could not specialize in particular areas unless they were first good firefighters. (Tossey Depo. Vol. IV at 27; Olding Depo. at 129-30.) O'Connor and Tossey both remember the speech being negative, and O'Connor recalled Olding stating more than once to the recruits that they could be fired at any time. (Tossey Depo. Vol. IV

at 27; O'Connor Depo. Vol. II at 219.) Olding was looking at O'Connor and Tossey at the time he stated that the recruits could be fired at any time. (Tossey Depo. at 41.) During his speech, Olding also told the recruits that they would no longer be able to choose their shifts based on seniority. (O'Connor Depo. Vol. I at 49.) O'Connor took this change of policy personally, because, given her seniority, she would have had first choice and been able to request the same shift that her friend Mike McNamara was working. Id. Olding had no direct contact with either O'Connor or Tossey during the academy. (Tossey Depo Vol. IV at 27; O'Connor Depo. Vol. II at 219.) Id. The decision to recommend administrative review of the recruits was that of Training Chief Hawkins. (Olding Depo. at 162-64; Deposition of Clarence Hawkins (Hawkins Depo.) at 63.)

Olding and Stacy Hohertz asked Captain Christopher Cook to be a trainer for the 2000 Academy. (Cook Depo. at 52.) Olding and Cook had been captains on the same rescue squad for approximately five years prior to the Academy and were friends. Id. at 53. Prior to be selected for the 2000 Academy, Cook had been disciplined for a case in which a female firefighter, Fawn Hawkinson, had complained about a sexually explicit photo, and Cook had handled the complaint at his own level when the workplace conduct policy dictated that the complaint should be reported to a supervisor to allow for a follow-up investigation. (Fuller Depo. at 108.) At one point, Fuller also temporarily reassigned Cook to a pool in which he would be rotated through other fire companies. Id. at 131-32. This reassignment came after Fuller discussed with Cook approximately seven or eight items of concern. (Cook Depo. at 49.) In addition, Fuller assigned Cook extra training because he thought people were finding Cook arrogant. Id. Further, Fuller explained that Cook seemed to regard the rescue squad as his own

and was not conducting personnel evaluations. Id. As a result, Fuller "thought it was time for him to kind of get a refresher and some awareness as to what the responsibilities of the rescue squad captain were." Id. At some point after Cook had been removed from his rescue squad, there was a claim made that he made an obscene gesture at a paramedic. (Fuller Depo. at 128.) Fuller had this allegation investigated but could not recall at his deposition what the results of the investigation were. Id. at 128-31. In August or September 2000, Cook was placed back on the rescue squad. (Cook Depo. at 40-41.)

### D. Participating in the 2000 Recruit Academy.

Because of their promotional rights, O'Connor and Tossey were automatically hired. (Olding Depo. at 57-58.) On October 3, 2000, O'Connor received a letter from Fuller stating he was offering her a job in the position of firefighter. (Boivin Aff.; Ex. 32.) After stating congratulations, the letter went on to state "[y]ou are being offered a position in the recruit orientation academy. Be advised that you will need to meet rigid academic, physical and skills requirements. You MUST satisfactorily pass all physical fitness performance standards by the END of the Academy, or you will be terminated from the department." Id. All of the recruits received the same letter. (O'Connor Depo. Vol. II at 122.) Tossey understood the rules of the Academy to be that if she failed two physical or written exams she would be reviewed, but that she had until the and of the Academy to correct the failures. (Tossey Depo. Vol. I at 203.) O'Connor understood the rules to be that if she failed two exams she risked termination, but also understood the letter to mean she had until the end of the Academy to pass all the tests. (O'Connor Depo Vol. II at 120-122.)

On October 16, 2000, 36 candidates, including Plaintiffs, began the Academy. At that

time, Plaintiff Tossey was 41 years old and Plaintiff O'Connor was 48. They were the only recruits over 40 years of age. (Tossey Aff. ¶ 7.) The Academy was conducted under the direction of a training officer, three assistant training officers, and six experienced firefighters, including Defendant Cook. Captain Patrick Flanagan stated that some firefighters at the time had the opinion that anyone of O'Connor's age would have a tough time in the Academy. (Flanagan Depo. at 58-59.) In addition, Olding came to his fire station for lunch in August of 2000 and stated that O'Connor had no business trying to be a firefighter at her age. Id. at 60. Another training officer, Tom McDonough was asked by fire department personnel whether he thought O'Connor could pass the Academy, he replied that he believed she could and that she was going to receive the same chance as everyone else. (McDonough Depo. at 94-95.) In his initial meeting regarding the recruits, Olding mentioned each of the recruits' ages, he also mentioned that O'Connor and Tossey were dispatchers, and demonstrated some apprehension over whether O'Connor's age would prevent her from completing the Academy. Id. at 23-24.

The curriculum included lectures, practical demonstrations, practice opportunities, and physical training provided in large and small group settings. The 2000 Academy Manual explained the evaluation process to the candidates as follows:

> Throughout the training academy you will be evaluated on your progress. The purpose of this process will be to evaluate diagnostic and mastery of minimum standards. In addition you will be evaluated on affective skills including attitude, teamwork, and adaptability to strenuous physical and mental activities.
>
> You will be given a weekly written and practical diagnostic exam. Weekly exams will be evaluated by the training staff. Weekly exams may include material from any previous week. The results of these exams will be to diagnose in what areas of the academy you may be having difficulty. From your scores on the weekly

> exam the instructors will provide suggestions and any required assistance that my improve your knowledge or performance in those skill areas that indicate help may be needed. You will be expected to maintain at least a 75 percent average on the weekly exams to be considered showing satisfactory progress. Two weeks of below 75 percent in practical or written testing will result in a review to determine continuation in the academy.
>
> A second level of evaluation will consist of quarterly, a mid-term, and final written and practical exam. These exams will be evaluated by the training staff. The purpose of these exams are to determine mastery of the academy's minimum standards for the skills taught. A minimum of 75 percent must be achieved on both the written and practical exams for both of these exams. Failure to achieve the minimum standards in these exams will result in a review to determine continuation in the academy.
>
> The evaluation process for both diagnostic and mastery of minimum standards will consist of on-going observations by instructor staff, written exams, instruct checklists for practical exams, instructor guided practice observation, video tape review, and individual quarterly progress reviews.
>
> If, during any of the above evaluation precesses a candidate's knowledge or practical competence is not satisfactory an administrative review will determine continuation in the academy.
>
> During the academy there are two different reports which instructors and training staff may fill out on you. The reports are called "Observation/Incident Report" and "Weekly Progress Review Report". These reports are meant to document individual progress, disciplinary actions, and notable achievements. These reports can also capture information concerning you affective skills. Negative reports will result in an administrative review to determine continuation in the academy.

(Villaume Aff.; Ex. 1: St. Paul Fire Department 2000 Academy Manual at 13.)

**1. Plaintiffs Participation in the Academy.**

**a. Julie Tossey.**

On the first day of the Academy, Tossey's group was designated to run around the

training site for a period of time. (Hawkins Depo. at 85.) Tossey committed a violation by leaving the course. Id. When Hawkins spoke to Tossey, she explained that she was walking off some side pain. Id. Hawkins believed, however, that Tossey was "ditching out of the exercise" after speaking with another person who observed her remain in an apparatus storage building for the period of time it took for her group to circle the training ground and return to where she was. Id. at 86. At that time, Hawkins spoke with Tossey about the incident, but did not prepare an Observation/Incident Report because he believed it would be an isolated incident. Id. On October 27, 2000, he changed his mind and prepared an Observation/Incident Report after receiving a subsequent report stating that on October 18, 2000, a similar incident occurred during which Tossey left the course during a 20-minute jogging session to throw up. (Tossey Deposition Exhibit 3 (Tossey Depo.; Ex. 3) at 51-52.; Hawkins Depo. at 86-87.) Tossey recalled being spoken to by Hawkins, but stated that it did not occur on the first day. (Tossey Depo. Vol. I at 191-92.) She did recall, however, being called into Hawkins' office after speaking with Gillman on the day of the incident. Id. at 190. She explained to Hawkins that she had left the course briefly because she had felt sick and vomited. Id. at 186-193. Although feeling sick had caused her to leave the course, Tossey was issued two negative Observation/Incident Reports, one for vomiting and one for leaving the course to vomit. Id. at 191. In a 1994 settlement concerning the entrance examination, the State of Minnesota, St. Paul, and Local 21 had agreed to eliminate the proposed one and one half mile run. (Boivin Aff.; Ex. 34, ¶ 3.)

Tossey alleges that during the Academy, Cook also claimed to have given her orders that were never actually given, ignored her questions, would not allow her to take off her mask although he allowed the other recruits to take off theirs, and told her she could not do it and was

not good enough. (Tossey Depo. Vol. I at 93-96, 213-14.) Tossey also alleges that although Cook issued her an Observation/Incident Report for failing to take the hose nozzle during an exercise, he never actually gave her the order to do so. Id. at 234-35.

When Tossey received a 76% on a written examination, she was told she should be at the top of the pack because she was number one on the list. Id. at 220. On November 9, 2000, Hawkins told her that he wanted to see a better attitude from her and that she should be first in line for exercises whether she thought she could do them or not. (Tossey Depo.; Ex. 3 at 26.) Tossey attempted to be first in line for the subsequent practice sessions, but the instructors did not always allow her to be. (Tossey Depo. Vol. II. at 86.) During a November 9, 2000 meeting between Hawkins and Tossey, Hawkins listed each of her failures that had been identified and Tossey disputed each, offering an explanation in writing for what she thought had actually happened. (Tossey Depo.; Ex. 3 at 26-27.) Tossey also repeatedly requested a mentor for the physical examinations, receiving only the response from Morehead that "they're working on it." (Tossey Depo. Vol. I at 198, 216-17, 231-32.)

On November 6, 2000, the recruits were administered the First Quarter Circuit Exam, a practical examination consisting of six tasks[1] with a seven-minute time limit. (Tossey Depo.; Ex.3 at 37.) Tossey stopped her exam after 7:12, having completed less than half of the tasks. Id. During her deposition, Tossey stated that she stopped after being informed she was over the time limit. (Tossey Depo. Vol. I at 205). On November 13, 2000, Tossey failed the test a second

[1]While wearing full gear, the recruits must: (1) carry a fire hose to a hydrant, connect the hose, and open the hydrant; (2) raise a ladder; (3) carry a fire hose bundle up to a fifth floor of a tower and then down to the third floor; (4) make a standpipe connection and then pick the hose bundle back up and exit the tower (5) tie a knot to secure an axe for hoisting; and (6) simulate a forced entry by using a sledge hammer to drive a beam.

time, completing five of the tasks satisfactorily and the sixth incorrectly or with safety concerns in 7:57. (Tossey Depo.; Ex.3 at STP 02137). Tossey attributed both of her failing times to equipment failure. (Tossey Depo. Vol. I at 205). She also understood them to constitute one rather than two failures because they involved the same test. Id. When she received an Observation/Incident Report for failing the retest, she requested that she be given the test again because her helmet had broken during the test. (Tossey Depo.; Ex. 3 at 18.) The decision whether to issue Observation/Incident Reports is a subjective evaluation left up to the individual training officers. (McDonough Depo. at 67.) Tossey explained that she had to hold the helmet on with one hand because it kept slipping, and she would fail if the helmet fell off. (Tossey Depo. Vol. I at 245, Vol. II at 106.) Tossey mentioned the problems with her helmet to Training Officer Wardell early in the Academy. (Deposition of Douglas Wardell (Wardell Depo.) at 100.) Wardell took the helmet to the repair shop, where it was repaired and Wardell was informed that they had been having problems with that kind of helmet. Id. When Tossey complained again about the helmet, Wardell issued her a new and different brand helmet. Id. This helmet was not issued to her, however, until after she failed the retest. (Tossey Depo. Vol. II at 106-07.) Tossey requested another retest from Wardell, but he did not convey this request to McDonough. (Wardell Depo. at 125-26.) Tossey also requested additional training help. (Tossey Depo. Vol. II at 108.) Wardell referred her to Dr. Gillman, who told her that she should work on technique rather than strength, adding that she was one of the biggest and strongest women he had seen come through the Academy. Id. at 109. On November 9, 2000, Hawkins spoke with her about incidents from her performance during practical training including: (1) failing to follow an order to take the nozzle up a ladder; (2) eating lunch without permission; and

(3) failing to practice pitched roof chopping. (Tossey Depo at 79-83.) During the talk, Tossey explained that: (1) she never heard an order to take the nozzle; (2) she did receive permission to eat lunch; and (3) she had practiced pitched roof chopping several times, but did not on two separate occasions, once because there was not time and once after being warned not to waste plywood because there would not be enough left for testing. Id.

On November 16, 2000, O'Connor and Tossey passed the ladder raise test and Tossey failed the Flat Chop Practical Test, exceeding the 2:00 time limit by 30 seconds. (Tossey Depo. Vol. I at 134; Tossey Depo.; Ex. 3 at 8.) She also observed trainers smoking cigars on city property in violation of city policy. (Tossey Depo. Vol. I at 134-35.) Tossey's November 16, 2000 Weekly Recruit Evaluation Report stated that she required excessive supervision to ensure she participated in hands on training, lagged behind trying things last, and was unable to complete the pitch roof chop. (Tossey Depo.; Ex. 3 at 20-22.) The report also stated that although she received a 76% on a weekly test, she needed to spend more time studying text books and standard operating procedures. Id. Finally, it recorded that she had failed the First Quarter Circuit Exam and re-test and seemed physically unfit to complete the quarterly test. Id. In the recruit comments section of the report, Tossey stated she believed she required help and suggestions with technique rather than excessive supervision, and believed she was able to complete the quarterly test in the required time. Id.

SPFD Chief Timothy Fuller stated that after Tossey and O'Connor failed the quarterly practical exam and retest they were subject to administrative review and it was his intention to terminate them both. (Affidavit of Timothy K. Fuller (Fuller Aff.) at ¶ 3.) At that time, however, he received a call from Tossey's husband, Ed Tossey, protesting the treatment she had

received and asking that she be given additional training. Id. As a result, Fuller stated that he withheld further action and directed the Academy staff to give Tossey and O'Connor special training. Id. at ¶ 4. Fuller explained that complaints concerning workplace conduct violations were given to Chief Carter to conduct an investigation. (Fuller Depo. at 110-112.) Ed Tossey's complaint, however, was passed on to Olding. Id. at 161. On Fuller's instructions, Olding met with the instructors and Hawkins, and found their reports of the events involving Julie Tossey inconsistent with Ed Tossey's description. During the meeting, all of the training officers informed Olding that they felt Tossey could not pass the Academy and/or that she should return to her previous job. (Olding Depo. at 163-164.) McDonough explained that he and two other training officers made a verbal recommendation that a male recruit, Daniel Paro, not continue in the Academy. (McDonough Depo. at 46.) They also recommended that O'Connor and Tossey not continue. Id. at 46-47. At least with respect to Tossey, however, Olding requested that the training officers also provide a memo with their recommendation. Id. In subsequent Academies, all of the McDonough's recommendations with respect to dismissing recruits who have failed two tests have been made face to face rather than in written form. Id. at 47 The training staff all provided their comments along with Tossey's file which contained her Observation/Incident Reports. Id. at 164-65. The training staff also felt that they had done enough for Tossey and should not have to do more. Id. at 166. They felt Tossey's attitude was poor, that she could be hurting the rest of the group, and that she should have been terminated even earlier. Id. Olding took the file to Carter and Fuller. Id. at 165.

On November 15, 2000, Ed Tossey told Fuller that there would be a chopping practical given on November 16. Id. at 158. Ed Tossey informed Fuller that Jack Conrad and Morehead

would be the people with whom Tossey was most comfortable. Id. at 159. As a result, Fuller assigned those two, along with Hohertz, whom he thought could be helpful because she was a woman, to see if there were any issues of technique to be addressed. Id. at 160. Morehead provided some instruction concerning how and where to chop the wood, while Conrad and Hohertz simply stood and watched. (Tossey Depo. Vol. II at 15-17.) Hohertz also said she did not know why she was even helping them. Id. O'Connor and Tossey then had the opportunity to practice the technique, which had not previously been demonstrated to them. Id. at 17. Hohertz recalled the instruction session taking approximately 30-45 minutes. (Hohertz Depo. at 83-84.) O'Connor and Tossey also volunteered for an optional Saturday training. Id. at 84.

On November 20, 2000, Tossey practiced chopping and took the retest on November 21. (Tossey Depo. at 135.) She failed the retest, stopping after 3:20 without completing the tasks of chopping the whole and clearing an opening. (Tossey Depo.; Ex. 3 at 5.) In her deposition, Tossey explained that she completed the entire test in 1:55 except for pushing the wood through the whole. (Tossey Depo. at 136.) She stated that she had not had the chance to practice the techniques shown to her the previous day. Id. at 137.

Throughout November 21, 2000, Cook repeatedly told O'Connor and Tossey that they were doing good jobs. (Tossey Depo. Vol. II at 141.) Tossey took this to be sarcasm. Id. When O'Connor and Tossey both failed the Flat Chop Practical retest, Fuller gave them written notice of their termination. Id. at ¶ 5. The letters stated that they had failed the quarterly practical examination and retest, a weekly practical examination and retest, and that these failures constituted a violation of the minimum standards listed in the 2000 Academy Manual. (Tossey Depo.; Ex. 3 at 3-4.) The letter went on to say that they had failed despite being provided with

training in the necessary practical skills, tutoring, and additional training opportunities. Id. As a result, Tossey was returned to her prior position as a fire dispatcher. Id.

During his discussion with both O'Connor and Tossey, Fuller never discussed the possibility of providing them with additional training and testing them on a different schedule from what had been established. (Fuller Depo. at 163-65.) Fuller did not extend to O'Connor and Tossey the option of resigning, and stated during his deposition that he was not aware of what O'Connor and Tossey's options were with respect to resigning. Id. at 165. Human Resources Director John Hamilton, however, believed it would have been within the discretion of the Fire Chief to provide them this option, noting that applicants in the past had been given leaves of absence permitting them to return to the Academy later to complete it. (Hamilton Depo. at 40.)

Tossey had previously suffered two back injuries: A T-11 compression fracture in 1995 or 1996, and an L-1 compression fracture in September 1999. (Tossey Depo. Vol. II at 159-62.) At the time she entered the Academy, Tossey had been cleared by doctors and was not suffering symptoms related to the fractures. Id. at 164. Wearing an air tank for hours each day of the Academy, however, aggravated her injuries, and she has continued to suffer back pain since. Id. at 164-65. Tossey testified that she has been prescribed medication and physical therapy for her back pain since the Academy, and at the time of her deposition, her back was in generally the same condition it was when she left the Academy. Id. at 179. When describing her current capabilities, Tossey stated that her physical therapist instructed her not to lift more than 10 pounds, and she found that if she lifted more than that it bothered her back. Id. at 180-81. When asked for examples of things she no longer lifts out of concern for her back, Tossey included her

children and baskets of laundry. (Tossey Depo. Vol. IV at 25. In addition, bending, sitting for long periods, kneeling, reaching, and walking for more than five or ten minutes caused her back to flare. Id. at 180. When asked if a person with a 10-pound lifting restriction would not be qualified to work as a St. Paul firefighter, Tossey's expert, John Colonna, replied such a person would not. (Colonna Depo. at 211.) Tossey also conceded that at the time of her June 11, 2002 deposition, she was not physically able to work as a firefighter. (Tossey Depo. Vol. II at 61.)

**b. Kathleen O'Connor.**

At the time she entered the Academy, O'Connor had been a volunteer firefighter with the Eden Prairie Fire Department since October 1985. (O'Connor Depo Vol. II at 393.) In the five years preceding October 2000, she responded to approximately 40-50 calls per month. Id. at 394. On October 10, 2000, she took the "Donning the SCBA" exam in which students are required to correctly don the SCBA "and put it into an operational mode wearing full turnout gear within a 1 minute time period in accordance to SPFD's Recruit Academy Training Program." (O'Connor Depo.; Ex. 8.) She failed the test and the October 31 retest, completing them in 1:15:85 and 1:03 respectively. (O'Connor Depo.; Exs. 8 & 12.) On November 2, 2000, after being told she would be up for review and termination if she failed again, O'Connor passed the second retest, completing the requirements in 46 seconds. (O'Connor Depo. Vol. I at 77; Ex. 14.)

On November 6, 2000, O'Connor failed the First Quarter Circuit Exam, completing all of the tasks in :13:43:54, rather than within the 7-minute limit. (O'Connor Depo.; Ex. 16) She did not attribute the failure to problems with equipment, and instead stated "it was mostly nerves." (O'Connor Depo. Vol. I at 87-88.) O'Connor and the three other female recruits attended a

weekend training session with Stacy Hohertz at the drill tower, but she lost a contact lens and chose not to participate. Id. at 109-110. During the second week of the Academy, O'Connor was unable to complete the circuit training, a combination of physical tasks. Id. at 58-59. Circuit training had not been used before the 2000 Academy, however, and O'Connor believed it was excessive and unfair. Id. at 59-60. Each of O'Connor's failures, as well as her success donning the SCBA on her third try were recorded in Observation Incident Reports and Weekly Recruit Evaluation Reports. (O'Connor Depo.; Exs 9-11, 13, 15, 19, and 20.) O'Connor also had difficulty lifting a dummy during the first three weeks of the Academy and had received Observation/Incident Reports for them. (O'Connor Depo. Vol. I at 57-60 & 83.) This was the dummy that had originally been used in the entrance examination, and had been thrown out after being challenged by the women. Id. at 60. In the third week, she succeeded in lifting the dummy and requested that Cook or Training Officer Wardell fill out an Observation/Incident Report noting that she could lift it. Id. at 84. Wardell recalled that he did not fill out such a report, but could not recall why. (Wardell Depo. at 90-91.) O'Connor recalled that Cook had been hostile and responded that "you don't get 'atta boys' for doing things that are expected of you." (O'Connor Depo. Vol. I at 83.)

Wardell observed that O'Connor, as well as all of the other recruits, improved their endurance and physical strength over time. (Wardell Depo. at 87-88.) On O'Connor's November 2, 2000 Weekly Recruit Evaluation Report for Week #3, Wardell checked "NO" to section five which asked whether at that time he felt she was suitable for "this type of work environment." (O'Connor Depo.; Ex. 15.) He indicated, however, that his answer was based on her ability rather than her attitude. Id. On O'Connor's November 9, 2000 Weekly Recruit Evaluation

Report for Week #4, Cook also checked "No," without indicating whether it was based on her ability, attitude, or both. (O'Connor Depo.; Ex. 20.) On section two of the Report, however, where Cook indicated she had failed the First Quarter Practical Exam, he wrote that O'Connor needed to work on strength and technique, but noted that she had been coming to class early and asking questions about technique. Id. When asked about these comments during her deposition, O'Connor explained that she was strong enough and knew the technique, but she needed to work on speed. (O'Connor Depo. Vol. I at 101.)

On November 13, 2000, O'Connor failed the retest of her First Quarter Circuit Exam, completing it in 10:02. (O'Connor Depo.; Ex. 21, Villaume Aff.; Ex. 4.) When reporting the retest results in a November 13, 2000 email, Hawkins noted that this time was a "[s]ignificant improvement over 13:43:54 fail on first attempt." (Boivin Aff.; Ex. 14.) In her deposition, O'Connor explained that she needed additional practice for the exam and believed she had until the end of the Academy to complete it. (O'Connor Depo. Vol. I at 114.) O'Connor and Tossey were the only recruits to fail the First Quarter Circuit Exam retest. Id. at 116. Hawkins' email stated that they would receive reports for failing the retest and that O'Connor would be counseled and informed that she would be up for administrative review as a result of failing two tests. (Boivin Aff.; Ex. 14.) In a letter to Hawkins on November 13, 2000, O'Connor mentioned that she and other recruits had taken his October 3, 2000 letter to mean that they had until the end of the Academy to pass all physical fitness performance standards, including the quarter practicals, and asked that he clarify the matter. (Boivin Aff.; Ex. 15.) In addition, O'Connor reiterated an issue from her meeting with Hawkins earlier in the day. Id. During this meeting, she explained that on Friday October 27 she had been told the SCBA retest would be the

following Friday, and, as a result, had not taken her SCBA home on the weekend to practice. Id. When, to her surprise, the SCBA retest was given the next Tuesday, she failed by three seconds. Id. O'Connor never received a response to her inquiry about the deadline for passing all of the physical fitness tests. (O'Connor Depo. Vol. I at 122.)

On November 16, 2000, O'Connor failed the Flat Chop Practical Test, and on November 21, 2000, failed the retest, completing them in 2:10 and 2:49 respectively. (O'Connor Depo.; Ex. 25; Villaume Aff.; Ex. 5.) O'Connor explained that her arms were too tired on November 16, because she only had the opportunity to practice the day before, and had practiced to the point of exhaustion. (O'Connor Depo. Vol. I at 125.) In addition, she was extremely sick on November 21, and could not catch her breath during the retest. Id. at 132.

All of the recruits were told that mentors could be provided if they were not getting the help they wanted from the instructors. (O'Connor Depo Vol. I at 136.) On the first Thursday of the Academy, O'Connor requested a mentor or her friend Mike McNamara to help her with some of the physical tests after hours. Id. at 137. Wardell mentioned the request to McDonough and Cook relayed the request to Hawkins. (Wardell Depo. at 48; Cook Depo. at 112-113.) Hawkins told Cook that Hohertz was there to help and Cook informed O'Connor. (Cook Depo. at 113.) In a November 9, 2000 email to the fire chiefs, Hawkins wrote that O'Connor had requested that McNamara be allowed to assist her during practice times, and that he denied the request and directed her to speak to Dr. Gillman and Hohertz about training techniques. (Boivin Aff.; Ex. 31.) Hawkins further wrote that he reminded O'Connor that McNamara could assist her with practice during off duty times but that he would not be allowed on the drill site during her on duty time. Id. Finally, he added that she might be a candidate for a tutor from the diversity

committee. Id.

The procedure for the Academy was that all mentors came from the diversity committee. (Wardell Depo. at 45-46.) Hohertz understood the procedure to be that mentors were provided for written examinations but that the Academy trainers were experienced with the physical portions of the test and could provide the necessary expertise for those subjects. (Hohertz Depo. at 35-36.) O'Connor made at least four requests to the training committee for a mentor, and after the second request on October 26, 2000, she called Tom Henry of the diversity committee directly. (O'Connor Depo. Vol. I at 41-42.) Henry said that of course someone would be willing to help her and he would find out if anyone had yet been recommended or assigned. Id. In the third or fourth week of the Academy, Henry spoke with O'Connor again, telling her he had brought the issue to Hohertz, who was also on the diversity committee. Id. Henry said that Hohertz informed him that O'Connor had been told she could work with whomever she wanted and believed O'Connor had a mentor. Id.

On November 21, 2000, O'Connor was also informed she had failed probation as a recruit and was being returned to her previous position as a fire dispatcher. (O'Connor Depo.; Ex. 29.) She declined to return to her position, however, because it required her to work with individuals she believed had discriminated against her. (O'Connor Depo. Vol. I at 14-16.) In addition, changes in hours, shifts, and management made the work less appealing. Id.

**c. Other Female Applicants.**

Jane Thompson and Kathryn Michalski, the other two women who attended the 2000 Academy, successfully completed it. (Affidavit of Jane Thompson ¶ 1; Affidavit of Kathryn Michalski ¶ 1.) It was not uncommon for both women to be in the same training groups as

O'Connor and Tossey. Id. at ¶¶ 2. Both stated they never experienced different treatment from the other recruits because of their sex, were never subjected to sexual harassment, and never witnessed any behavior they believed to be discriminatory toward women. Id. at ¶¶ 3-5.

**d. Other Unsuccessful Applicants.**

Daniel Paro, who attended the 2000 Academy, failed two written tests within the first three weeks, and in the fourth week was asked to leave. (Deposition of Daniel R. Paro (Paro Depo.) at 14.) After failing his first written exam during the second week, Paro received a sheet notifying him he had failed and was told by Wardo that he should get a mentor. Id. at 16. He was also told that if he failed another written test he would be asked to leave. Id. at 19. On November 7, 2000, after he failed a second written exam, Paro received a letter from Fuller informing him that Fuller intended to terminate his employment. (Paro Depo.; Ex. 1 at 1.) The letter also stated that because Paro was a veteran as defined by Minn. Stat. § 197.447, he had the right under Minn. Stat. § 197.46 to request a hearing on the reasonableness of his removal, and if he requested a hearing, Paro would remain a St. Paul employee pending the decision and or appeal. Id.

On November 8, 2000, Paro met with Assistant Human Resources Director Mark Robertson, who recommended that he request a hearing and see if it was possible to be reinstated in the next academy. (Paro Depo. at 34-36.) On November 14, 2000, Paro met with Fuller and asked if he could resign and later be reinstated. Id. at 36-38. On January 8, 2001, Paro requested that the hearing be canceled, and on March 20, 2001, he filled out a form resigning with an effective date of January 8, 2001. Id. at 49-52. Paro was subsequently reinstated to the 2001 Academy which began on May 14. (Paro Depo.; Ex. 1 at 12.) According to Civil Service Rule

23.B, Tossey and O'Connor would have had to resign from those positions and forfeit their seniority and promotional preference in order to be eligible for the Reinstatement Register. (Robertson Aff. ¶ 6.)

#### e. Successful Applicants Who Failed Certain Exams.

Anthony Cobenais was a St. Paul Parks and Recreation employee at the time he entered the 2000 Academy. (Deposition of Antony Cobenais (Cobenais Depo.) at 6-7.) On Friday, November 10, 2000, he was diagnosed with testicular cancer, and after informing the Academy the following Monday, Cobenais was excused from certain classes and allowed to make up missed exams. Cobenais was also given the option of waiting and returning for the next Academy, but declined. (Cobenais Depo. at 33.) (Tossey Depo. Vol. II at 41; Cobenais Depo. at 10-12.) After missing the next four class days, Cobenais made up the written exam he had missed and took the rest of the written exams on schedule. (Cobenais Depo. at 17 & 26-27.) Doctors had placed a lifting restriction on Cobenais at that time, and he could not take the Flat Chop Practical and Mid-term Practical Circuit exams when scheduled and had to make them up later. Id. at 13-14, 17, 27-28. Cobenais also received negative incident reports for passing at least one written test with a score of less than 80% and failing a repelling written exam, the lecture for which had been conducted while he was in surgery. Id. at 19-20. He ultimately retook the repelling written exam. Id. at 40.

### E. Previous Fire Dispatcher Applicants.

In 1994 three fire dispatchers, Scott Case, Thomas Cunnien, and Thomas Murakami, also entered the Academy. (Robertson Aff. ¶ 2.) At that time, the salary for dispatchers and firefighters was the same. Id. While attending the Academy, these three dispatchers did not

receive EMT premium pay. When O'Connor and Tossey began the Academy, their bi-weekly salaries were $1,793.04 and $1,931,98 respectively, while the bi-weekly salary for all other recruits entering the 2000 Academy was $1,431,33. Id. at ¶¶ 3-4. Kurt Chelgren, who had previously worked as a SPFD vehicle mechanic earning the equivalent of $1,657.60 bi-weekly, took a bi-weekly reduction in pay of more than $200 when he was dropped to $1,431,33. Id. at ¶ 5.

## II DISCUSSION

At the April 4, 2003 motions hearing, Plaintiffs stated that they had dismissed or chosen not to address any of the Counts against the individual Defendants except reprisal/ retaliation in violation of the Minnesota Human Rights Act (MHRA). In addition, Defendant City of St. Paul noted that the only Counts against it which Plaintiffs had addressed in their opposition to its motion for summary judgment were: (1) unlawful sex discrimination/disparate treatment; (2) deprivation of equal protection of the laws; (3) deprivation of right to due process of law; (4) age discrimination; (5) retaliation/reprisal; (6) agency; and (7) vicarious liability/respondeat superior. In addition, St. Paul explained that it believes agency and vicarious liability/respondeat superior are not actual counts, but elements of the other claims, and with respect to them, it accepts that it is legally responsible for the actions of its officers. Plaintiffs did not dispute this representation of the remaining Counts or St. Paul's characterization of the elements of agency and vicarious liability/respondeat superior. As a result, this Report and Recommendation will only address these remaining Counts, and it will regard the issue of liability for its employees as having been conceded by St. Paul.

### A. Summary Judgment Standard.

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "Once the moving party shows that there are no material issues of fact in dispute, the burden shifts to the nonmoving party to set forth facts showing that there is a genuine issue for trial." Donovan v. Harrah's Maryland Heights Corp., 289 F.3d 527, 529 (8th Cir. 2002) (citing Celotex, 477 U.S. at 323). "In opposing a motion for summary judgment, the nonmovant must make a showing that, if reduced to admissible evidence, would be sufficient to carry the nonmovant's burden of proof at trial." Celotex, 477 U.S. at 323

> We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses. Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred.

Celotex, 477 U.S. at 324.

> [T]he Court understands *Celotex* to require information presented in opposition to summary judgment to be substantively admissible, even if the actual form of the information is not. This view is in accord with several other Circuit Courts of Appeals. *See Thomas v.*

> *International Business Machines*, 48 F.3d 478, 485 (10th Cir.1995) ("To be sure, the nonmoving party need not produce evidence in a form that would be admissible at trial, but the content or substance of the evidence must be admissible.") (citing *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267-68 (7th Cir.1994); *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990) (stating that hearsay testimony that would be inadmissible at trial, may not be included in an affidavit to defeat summary judgment).

International Ship Repair & Marine Services, Inc. v. St. Paul Fire & Marine Ins. Co., 906 F. Supp. 645, 649 (M.D. Fla. 1995).

> Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment. *See Randle v. LaSalle Telecommunications, Inc.*, 876 F.2d 563, 570 n. 4 (7th Cir.1989); *Martin v. John W. Stone Oil Distributor, Inc.*, 819 F.2d 547, 549 (5th Cir.1987); *Pink Supply Corp. v. Hiebert, Inc.*, 788 F.2d 1313, 1319 (8th Cir.1986); *Finn*, 782 F.2d at 16-17; *Blair Foods. Inc. v. Ranchers Cotton Oil*, 610 F.2d 665, 667 (9th Cir.1980); *Daily Press, Inc. v. United Press International*, 412 F.2d 126, 133 (6th Cir.), *cert. denied*, 396 U.S. 990, 90 S.Ct. 480, 24 L.Ed.2d 453 (1969); *Morrissey v. Procter & Gamble Co.*, 379 F.2d 675, 677 n. 2 (1st Cir.1967). Thus, absent a showing of admissibility--and none was forthcoming here-- appellant may not rely on rank hearsay, whether or not embodied in an interrogatory answer, to oppose proper motions for summary judgment.

Garside, 895 F.2d at 50.

Under both the ADEA and the MHRA, disparate treatment claims based on indirect evidence are governed by the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Evers v. Alliant Techsys., Inc., 241 F.3d 948, 955 (8th Cir. 2001) (citations omitted).

**B. Sex Discrimination.**

Absent direct evidence, federal sex discrimination claims are traditionally analyzed under the burden shifting scheme detailed in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

See, e.g., LaCroix v. Sears, Roebuck, and Co ., 240 F.3d 688, 693 (8th Cir.2001). To establish a prima facie case of sex discrimination, a plaintiff must demonstrate that she: (1) is a member of a protected class; (2) was qualified to perform her job; (3) suffered an adverse employment action; and (4) was treated differently than similarly situated persons of the opposite sex. Id. If the plaintiff makes out a prima facie case, the burden of production shifts to the defendant "to offer a nondiscriminatory reason for its action." Bergstrom-EK v. Best Oil Co., 153 F.3d 851, 857 (8th Cir. 1998) If the defendant offers a nondiscriminatory reason, the burden shifts back to the plaintiff to show that "she has sufficient admissible evidence from which a rational factfinder could find that [the defendant's] proffered reason was false or not the real reason for its action, and that intentional discrimination was the real reason." Id. at 857-58.

### C. Age Discrimination.

> The federal Age Discrimination in Employment Act (ADEA) and the Minnesota Human Rights Act (MHRA) both forbid an employer from taking adverse employment action against an employee because of her age. 29 U.S.C. § 623(a)(1) (ADEA) (barring an employer from discriminating against an individual "with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age"); Minn.Stat. § 363.03, subd. 1(2)(c) (MHRA) (providing that an employer shall not "discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment" because of age).

Evenson v. Maytag Appliances Sales Co., 2003 WL 21273453, *5 (D. Minn. May 27, 2003).

In order to establish a prima facie case of age discrimination, a plaintiff must establish: (1) she was at least 40 years old; (2) she was terminated, (3) she was meeting her employer's reasonable expectations at the time of her termination; and (4) she was replaced by someone substantially younger. See, e.g., Mayer v. Nextel West Corp., 318 F.3d 803, 806 (8th Cir. 2003).

**D. Retaliation.**

> Title VII prohibits employers from retaliating against employees who file charges of discrimination or who assist others in opposing discrimination. 42 U.S.C. § 2000e-3(a). The legal framework for analyzing retaliation claims under Title VII is the familiar three-stage, burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this analysis, a plaintiff must first establish a prima facie case of retaliation. To do this, a plaintiff must show that: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the adverse employment action and the protected activity. *Stevens v. St. Louis Univ. Med. Ctr.*, 97 F.3d 268, 270 (8th Cir.1996). A defendant must then rebut the plaintiff's prima facie case by presenting evidence of a legitimate, non-retaliatory reason for the action it took against the plaintiff. *Coffman v. Tracker Marine, LP*, 141 F.3d 1241, 1245 (8th Cir.1998). If the defendant makes this showing, the plaintiff must then establish that the defendant's proffered reason was a pretext and that illegal retaliation was a motivating reason for the defendant's decision. *Id.*

EEOC v. Kohler Co., 2003 WL 21543770, *4 (8th Cir. July 10, 2003).

A reprisal claim under the MHRA is also analyzed under the McDonnell Douglas burden-shifting test. See, e.g., Hoover v. Norwest Private Mortgage Banking, 632 N.W.2d 534, 548 (Minn. 2001). The MHRA further specifies that reprisal concerns "any individual who participated in the alleged discrimination." Minn. Stat. § 363.03, subd. 7.

**E. Individual Liability under the MHRA.**

The Minnesota Supreme Court has not directly addressed the issue of whether a supervisor can be held individually liable under the MHRA. In Obst v. Microtron, Inc., 588 N.W.2d 550, 553-54 (Minn. Ct. App. 1999), the Minnesota Court of Appeals considered whether a vice president and general manager of a company could be held personally liable under the Minnesota Whistleblower Act, Minn. Stat. § 181.932, noting it was a case of first impression. Id.

at 553. In reaching its conclusion, the court relied on federal cases holding that there is no individual liability for employees or supervisors under Title VII and compared the definition of "employer" in the Whistleblower Act with the definition in Title VII. Id. at 553-54. The court explained that the definition of "employer" in the Whistleblower Act was much narrower than that in Title VII, and accordingly concluded that "[u]nder the unambiguous language of the statute, the definition of employer in the Minnesota whistleblower act does not impose liability on individual supervisors." Id. at 554.; accord Anderson-Johanningmeier v. Mid-Minnesota Women's Ctr., Inc., No. C3-02-938, 2003 WL 42273, at *2 n.3 (Minn. Ct. App. Jan. 7, 2003).

The Whistleblower Act defines "employer" as "any person having one or more employees in Minnesota and includes the state and any political subdivision of the state." Minn. Stat. § 181.931, subd. 3. The MHRA defines "employer" as "a person who has one or more employees." Minn. Stat. § 363.01, subd. 17. Thus, the definitions of employer in both Acts are nearly identical. Accordingly, it seems clear that at least the Minnesota Court of Appeals would hold, as it did under a nearly identical definition in the Whistleblower Act, that individual employees and supervisors are not "employers" under the MHRA, and, thus, are not subject to individual liability.[2]

The Obst court relied largely on federal cases interpreting Title VII to correctly conclude that the Minnesota Whistleblower Act does not impose individual liability on supervisors. The vast majority of Federal Circuit Courts of Appeals have held that there is no individual liability

[2] Individual employees may be subjected to liability under one specific provision of the MHRA. § 363.03, subd. 6 prohibits any person from aiding and abetting a violation. Liability under this section does not appear to be at issue in this case, because Plaintiffs have abandoned their adding and abetting Count.

for employees or supervisors under Title VII. See generally Lenhardt v. Basic Inst. of Tech., 55 F.3d 377, 380-81 (8th Cir. 1995) (surveying cases from sister circuits holding that supervisors are not subject to individual liability under Title VII). Indeed, the Eighth Circuit "quite recently has squarely held that supervisors may not be held individually liable under Title VII." Bonomolo-Hagen v. Clay Cent.-Everly Comty. Sch. Dist., 121 F.3d 446, 447 (8th Cir. 1997) (per curiam) (citing Spencer v. Ripley Cty. State Bank, 123 F.3d 690, 691-92 (8th Cir. 1997)); see also e.g., Haynes v. Williams, 88 F.3d 898, 901 (10th Cir. 1996); Gary v. Long, 59 F.3d 1391, 1399 (D.C. Cir. 1995). Title VII is the federal counterpart to the MHRA, and, as noted, "in construing the MHRA, we [Minnesota courts] apply law developed in federal cases arising under Title VII of the 1964 Civil Rights Act." Fletcher v. St. Paul Pioneer Press, 589 N.W.2d 96, 101 (Minn. 1999). Therefore, this Court would expect Minnesota courts to hold that employees and supervisors are not subject to individual liability under the MHRA, except as noted. See supra note 2.

Finally, in Lenhardt, the Eighth Circuit was forced to decide whether a supervisor/president/sole shareholder was subject to individual liability under the Missouri Human Rights Act because the supervisor/president was an "employer." 55 F.3d at 378. The Eighth Circuit predicted that "the Missouri Supreme Court would hold that the definition of the term employer in the MHRA does not subject employees, including supervisors or managers, to individual liability." Id. at 381. This Court believes the Minnesota Supreme Court would hold the same, except as noted. See supra note 2. Indeed, one court within this district has so held. Waag v. Thomas Pontiac, Buick, GMC, Inc., 930 F.Supp. 393, 407-08 (D. Minn. 1996) (holding that supervisors "cannot be held individually liable under Title VII and the MHRA").

F. **Desert Palace.**

In Desert Palace, Inc. v. Costa, 123 S.Ct. 2148, 2150 (2003), the United States Supreme Court concluded that a plaintiff need not present direct evidence of discrimination in order to obtain a mixed motive jury instruction under Title VII or the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991. Through this holding, the Court eliminated the previous distinction between direct and indirect evidence put forth in Justice O'Connor's concurrence in Price Waterhouse v. Hopkins, 490 U.S. 228, 269-70 (1989). Under Justice O'Connor's concurrence "the burden on the issue of causation would shift to the employer only where a disparate treatment plaintiff could show by direct evidence that an illegitimate criterion was a substantial factor in the decision." Desert Palace, 123 S.Ct at 2151. Absent direct evidence, a plaintiff would instead have to proceed through the McDonnell Douglas burden-shifting scheme. See, e.g., Mohr v. Dustrol, Inc., 306 F.3d 636, 639-40 (8th Cir. 2002).

The Court in Desert Palace observed that the statutory language of the Civil Rights Act of 1991, which was passed after Price Waterhouse, made no distinction between direct and indirect evidence. 123 S.Ct. at 2153-53. Further, given conventional rules of civil litigation, the Court found no reason itself to draw such a distinction. Id. at 2154. Therefore, it concluded that a plaintiff did not require direct evidence to obtain a mixed motive jury instruction, and effectively shift the burden to a defendant to prove the affirmative defense that it would have made the same decision absent the impermissible motivating factor. Id. at 2155. The Court specifically declined, however, to decide whether the Civil Rights Act of 1991 "applies outside the mixed-motive context." Id. at 2151 n.1.

The state of the law in the wake of Desert Palace is not entirely clear. In Kohler, the

Eighth Circuit applied the McDonnell Douglas test to a retaliation claim, and did not refer to Desert Palace. 2003 WL 21543770 at *4. In Elayaperumal v. Medtronic, Inc., 2003 WL 21402602, *7 (D. Minn. June 17, 2003) the court applied the McDonnell Douglas test to a race discrimination claim after concluding that it was strictly a pretext case. In three other decisions issued on June 13, 2003, however, including Dare v. Wal-Mart Stores, Inc., 2003 WL 21382493 (D. Minn. June 13, 2003), the Court has understood Desert Palace to mean that McDonnell Douglas should not apply to federal discrimination claims even those involving a single-motive rather than mixed-motive claims. The Court in Dare also recognized, however, that the Minnesota Supreme Court has not yet acted to change the law under the MHRA, and, consequently, the McDonnell Douglas burden-shifting scheme should still be applied to MHRA claims. Id., at *5.

**G. Equal Protection.**

> To establish a gender-based claim under the Equal Protection Clause, the appellants must, as a threshold matter, demonstrate that they have been treated differently by a state actor than others who are similarly situated simply because appellants belong to a particular protected class. *See, e.g., Klinger v. Department of Corrections*, 31 F.3d 727, 731 (8th Cir.1994), *cert. denied*, 513 U.S. 1185, 115 S.Ct. 1177, 130 L.Ed.2d 1130 (1995). In general, the Equal Protection Clause requires that the government treat such similarly situated persons alike. *See, e.g., City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); *Klinger*, 31 F.3d at 731; *Moreland v. United States*, 968 F.2d 655, 660 (8th Cir.) (en banc), *cert. denied*, 506 U.S. 1028, 113 S.Ct. 675, 121 L.Ed.2d 598 (1992). Treatment of dissimilarly situated persons in a dissimilar manner by the government does not violate the Equal Protection Clause. *Klinger*, 31 F.3d at 731; *see Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp.*, 21 F.3d 237, 242 (8th Cir.1994); *Women Prisoners of the Dist. of Columbia Dep't. of Corrections v. District of Columbia*, 93 F.3d 910, 924 (D.C.Cir.1996). Therefore, the initial inquiry in any equal protection claim is whether the plaintiff has

> established that she was treated differently than others who are similarly situated to her. *Klinger*, 31 F.3d at 731; *United States v. Whiton*, 48 F.3d 356, 358 (8th Cir.), *cert. denied*, 516 U.S. 886, 116 S.Ct. 227, 133 L.Ed.2d 156 (1995). As we observed in Klinger, "Absent a threshold showing that she is similarly situated to those who allegedly receive favorable treatment, the plaintiff does not have a viable equal protection claim." 31 F.3d at 731.

Keevan v. Smith, 100 F.3d 644, 647-48 (8th Cir. 1996).

"Because age is not a suspect classification under the Equal Protection clause, states may discriminate on the basis of age if the age classification is rationally related to a legitimate state interest." McGinty v. New York, 251 F.3d 84, 91 (2d Cir. 2001) (citing Kimel v. Florida Board of Regents, 528 U.S. 62 (2000)).

### H. Due Process.

> To establish a procedural due process violation, a plaintiff must demonstrate that he has a protected property or liberty interest at stake and that he was deprived of that interest without due process of law. A protected property interest exists where a plaintiff has a "legitimate claim of entitlement" to a benefit that is derived from a source such as state law. A plaintiff has a protected property interest in his employment if he can show that he could have been fired only for good cause.

Hopkins v. Saunders, 199 F.3d 968, 975 (8th Cir. 1999) (citations omitted). "[A]n at-will probationary employee does not have a protected property interest in continued public employment." Sommers v. City of Minneapolis, 245 F.3d 782, 785 (8th Cir. 2001).

## III. THE PARTIES' POSITIONS

### DEFENDANTS

### A. Counts One and Four: Sex and Age Discrimination.

#### 1. Prima Facie Case.

Defendant St. Paul argues that Plaintiffs failed to produce evidence establishing a prima facie case of age or sex discrimination because they were not qualified for the benefit they sought. St. Paul explains that Plaintiffs failed the First Quarter Circuit Exam retest and the Flat Roof Chop test and retest. St. Paul emphasizes that firefighting is a dangerous and physically demanding profession. Therefore, "the SPFD and all other career fire departments take firefighting training very seriously to ensure to the maximum extent possible the safety of the public and of fellow emergency responders." St. Paul states that it is undisputed that it has not changed the Academy's curriculum or practical testing since 1992, and the tests are objective, timed, and identical for men and women regardless of age. Further, the 2000 Academy Manual made clear that failing a quarterly exam would result in administrative review to determine whether to terminate a recruit, and two weeks of failing scores on weekly exams would result in administrative review. St. Paul adds that it is undisputed that all recruits were made aware of these standards at the outset of the Academy. In addition, when Plaintiffs and two other recruits failed the First Quarter Circuit Exam, they were all given the chance to retest and were offered a special weekend training session with Hohertz. When the retest was given, the other two female recruits passed.

After failing the Flat Roof Chop Practical test, Plaintiffs were under administrative review and Fuller had decided to terminate them. Although Fuller acceded to Ed Tossey's request and gave Plaintiff's additional training and the chance to retest, he terminated them after they failed a second time. St. Paul explains that "measured against longstanding, previously published, objective, gender neutral performance standards, Plaintiffs repeatedly failed to meet the SPFD's legitimate performance expectations and were not qualified to continue in the

Academy."

St. Paul states that Fuller's letter welcoming the recruits does not affect the legitimacy of Plaintiff's termination. It explains that no reasonable inference could be drawn from this letter that Plaintiffs had until the end of the Academy to pass all tests. St. Paul argues that the letter states what is necessary to succeed, not what is sufficient. Further, it is unreasonable to infer that a single sentence from Fuller abrogated the 2000 Academy Manual, all other SPFD standard operating procedures, and eight years of customary practice and procedure for training. Further, the SPFD dispelled any such inference when it subsequently provided the recruits with the manual and dismissed Paro in the third week.

St. Paul also argues that nothing in the letter controverts the fact that Plaintiffs were the only recruits to repeatedly fail the quarterly test and subsequently fail a weekly practical test. All recruits, not just Plaintiffs, had equipment problems. And all these other recruits, including two women, passed the physical tests despite the equipment problems. Further, the two other female recruits testified that they neither experienced nor witnessed any discriminatory behavior. Because there is no evidence that Plaintiffs were treated differently from other recruits, St. Paul concludes that allegations of defective equipment have no probative value.

St. Paul also argues that Tossey was not qualified to be a firefighter because of her back injuries. It restates that Tossey testified that her back was in the same condition currently that it was when she left the Academy. After recounting Tossey's current restrictions, including not being able to lift more than ten pounds, and her own admission that her current condition prevents her from being a firefighter, St. Paul concludes that Tossey cannot satisfy the qualification element of her prima facie sex and age discrimination claims.

### 2. Pretext.

St. Paul argues that Plaintiffs cannot demonstrate that its stated reason for terminating them was pretextual. It states it is undisputed that Fuller terminated Plaintiffs for failing their quarterly and weekly tests. Further, the requirement of passing these tests was a longstanding published standard, which all recruits were advised of at the beginning of the Academy. St. Paul explains that the other male who failed two tests was ejected from the Academy. In addition, the other two women who passed their tests completed the Academy and entered the firefighter corps. St. Paul argues that all of this evidence provided demonstrates that the SPFD applied its rules equally to men and women regardless of age.

### B. <u>Count Two: Equal Protection.</u>

St. Paul argues that it is entitled to summary judgment on the equal protection claim because Plaintiffs have failed to produce any admissible evidence that it treated similarly situated males differently. Although the 1994 male dispatchers were not forced to take a pay cut or give up their EMT pay, St, Paul explains that this was because at the time they entered the Academy the salary for both positions was the same, and the dispatchers did not receive their EMT pay during the Academy. In contrast, Plaintiffs kept their higher dispatcher salaries when they entered the 2000 Academy, while a male SPFD employee took a substantial pay reduction to enter the Academy. "Thus Plaintiffs were treated better in that respect than any other recruits."

St. Paul also argues that to the degree that Plaintiffs and Paro were similarly situated, they were treated the same. He was also ejected from the 2000 Academy for failing two tests. Although Paro was later treated differently, by being allowed to resign and reenter the next Academy, this was done because he was a veteran, and, consequently, had rights no other

probationary employees had. Further, St, Paul explains, Plaintiffs did not request reinstatement, and resignation at that time for them would have meant the loss of their dispatcher jobs, seniority, and the promotional preference without which they would not have placed high enough to have been hired in the first place.

Cobenais also was not similarly situated to Plaintiffs, according to St. Paul. Unlike Plaintiff's complaints of feeling ill, Cobenais reported to the Academy that his doctor had told him he had cancer and needed immediate surgery. In addition, prior to this report, Cobenais had not failed any tests. Moreover, he only missed four days related to his illness, made up his missed tests, and completed the Academy while enduring chemotherapy. "Thus, Mr. Cobenais's medical condition and academy record demonstrate that he was not similarly situated to Plaintiffs." Finally, St. Paul notes that age is not a suspect class under the Equal Protection Clause.

**C. <u>Count Three: Due Process.</u>**

Plaintiffs' due process claim must fail, according to St. Paul, because the discharge of an at-will employee does not implicate procedural due process rights. St. Paul explains that as recruits, Plaintiffs were at-will probationary employees. Citing its earlier argument concerning Fuller's letter, St. Paul explains that this letter did not confer any property interest in continued employment at the Academy. Further, St. Paul states any other interpretation of the letter would be absurd because it would merely confer a property interest that would immediately be extinguished on successful completion of the Academy. Citing St. Paul Civil Service Rule 10, St. Paul adds that all firefighters are at-will probationary employees for their first year on the job.

**D. <u>Count Six: Reprisal.</u>**

Defendant Olding argues that Plaintiffs have not made a colorable MHRA claim of reprisal against him. He notes that the MHRA limits reprisal actions to individuals "who participated in the alleged discrimination." Olding explains that Plaintiffs have made no claim that he aided and abetted in the alleged discrimination. He states that Plaintiffs never claimed to have been victims of sex or age discrimination until after they were terminated from the Academy. Therefore, Olding contends that events at the Academy cannot form the basis of an MHRA reprisal claim. With respect to the alleged discrimination connected to the initial entrance exam, Olding explains that Plaintiffs do not and cannot claim that he participated in this activity. Olding also argues that there is no basis for asserting that the 1999 disputes concerning dispatchers' pay and promotional preference rights fall within the protections of the MHRA. He states that the these issues are "protected-class neutral," as they equally benefitted men. Thus, "Plaintiffs' case is built upon the unfounded presumption that anyone who objected to dispatchers having promotional pay and promotional preference rights was somehow discriminating against women."

Plaintiffs have also failed, according to Olding, to demonstrate causation or what conduct of his constitutes reprisal. He explains that it is undisputed that Fuller made the termination decision. Further, when Fuller decided to give Plaintiffs an additional chance to remain in the Academy if they passed the Flat Chop retest, Olding complied with Fuller's order to have additional training provided to them. When they failed, it was Fuller who ultimately terminated them.

Finally, Olding denies Flanagan's claim that he made the comment that O'Connor "has no business out there trying to be a firefighter at that age," and Holmgren's claim that he stated

he could control the Academy and "wash out" Plaintiffs. Further, he argues that concerns over whether someone will pass a training program cannot serve as the basis for a discrimination claim. In addition, the alleged comments are immaterial, according to Olding, because Plaintiffs have provided no evidence that he ever acted on them.

Defendants St. Paul, Fuller, and Cook argue that Plaintiffs have merely used purloined personal information to attempt to smear Cook by suggesting he is a misogynist. They explain that Cook's discipline for violating the Workplace Conduct Policy arose from his decision to handle a complaint by a female firefighter objecting to a sexually explicit photo at the company level rather than reporting it to his supervisor. In addition, the allegation of an obscene gesture was made by a male firefighter and never corroborated. Cook also explains that Plaintiffs failed to produce evidence that he acted as a perpetrator in any of the predicate discrimination they allege. Fuller and Cook add that because they were named in their official capacity only, the reprisal claim is alleged only against St. Paul.

St. Paul, Fuller, and Cook refer to St. Paul's earlier arguments with respect to the sex and age discrimination claims and conclude that Plaintiffs have failed to produce any evidence establishing a causal connection between any statutorily protected activity and Fuller's decision to dismiss them from the Academy, or that the stated reason was pretext. Further, "the retaliation claim cannot be reconciled with the fact that Chief Fuller gave Plaintiffs another chance to continue which he did not give a male recruit."

**PLAINTIFFS**

Plaintiffs respond that summary judgment is inappropriate for their sex discrimination, age discrimination, and retaliation claims because there are disputed issues of material fact.

They emphasize that the threshold for making a prima facie case of discrimination is minimal.

**A. Counts One and Four: Sex and Age Discrimination.**

Plaintiffs state they have made a prima facie case of sex and age discrimination. They argue that they were qualified for their positions throughout the Academy. They explain first that the training officers did not provide them with the time and assistance necessary to increase their endurance and speed and timely pass the tests. Plaintiffs contrast their treatment to that of Cobenais, who was permitted to take tests out of sequence and asked if he wanted to wait and return for the next Academy. In addition, they emphasize that they had until the end of the Academy to pass all of the physical tests, and, therefore, were unfairly terminated well before the end. Thus, they were denied the opportunity to significantly improve. Moreover, even if Defendants disagree with their interpretation of Fuller's letter, Plaintiffs argue it is, nevertheless, a question for the factfinder at trial.

Unlike the tests conducted at the initial entrance examination, Plaintiffs note that the physical tests at the Academy never went through a validation and norming process to assure they are not discriminatory to women, or to determine that they serve their intended purposes. Plaintiff Tossey also disputes Defendants' claim that she was not qualified because of pre-existing back problems. She states that nothing in the record suggests that either she or O'Connor had any disqualifying problems. Instead, training officers stated that both their abilities improved during the Academy. Because they were improving, Plaintiffs conclude that the SPFD chose to get rid of them before they could pass the tests and become qualified firefighters.

**B. Count Six: Reprisal.**

Plaintiffs state that they engaged in statutorily protected activity when, along with other female applicants, they filed charges with the MDHR claiming the physical tests in the entrance examination were discriminatory. In addition, they quite vocally opposed Fuller's attempts to change their promotional preference rights and seniority pay. Plaintiffs argue that the causal connection between their behavior and the adverse employment action is apparent because, "[t]he very people Plaintiffs complained about (Fuller and Olding) were involved in and made the termination decision."

### C. <u>Pretext on Counts One, Four, and Six.</u>

Plaintiffs argue that Defendants' proffered explanation that they were terminated for failing the physical tests is pretextual. Plaintiffs emphasize that they need not demonstrate that discrimination was the sole or primary cause of their termination, only that discriminatory animus more likely than not motivated their termination. They argue there is a genuine issue of material fact with respect to pretext because firefighters, trainers, and Olding expressed concern over their age. Moreover, efforts were taken over approximately a two-year period to discourage them from pursuing the firefighter positions by: (1) attempting to eliminate promotional preference rights thereby eliminating them from the hiring list; (2) interpreting the promotional preference rule so that they would be eliminated from the hiring list; (3) attempting to amend the rule concerning seniority pay so that they would have to take a significant pay cut if they were promoted to firefighters; (4) using a mannequin with a larger chest circumference in the entrance exam to eliminate women; (5) appointing former Union President Olding to the assistant training position after he had been very vocal in opposing promotional preference rights, seniority pay, and women in the SPFD; (6) giving Olding free hand to select trainers he believed would wash

them out; and (7) allowing and encouraging a male recruit to resign and automatically start fresh at the next Academy. Plaintiffs add that the record includes disparaging age-related remarks made by Olding and other training officers to Fuller.

**D. Count Two: Equal Protection.**

Plaintiffs argue that fact issues bar summary judgment on their equal protection claim. They state that Paro, a younger male recruit, was terminated for failing tests but then allowed to resign and start again at the next Academy. Further, Cobenais was able to take tests out of sequence. Plaintiffs argue that there is no basis for Plaintiffs having been treated any differently. They restate that their behavior, motivation, attitude, and performance was exemplary, and their only difficulty was completing the tests in a short enough amount of time. Tossey adds that she disputes any claims that she had a bad attitude and her evaluator's testimony supports her claim. Therefore, "this is a material fact issue for the jury to decide."

**E. Count Three: Due Process.**

Plaintiffs state that summary judgment is also inappropriate on their due process claim. They explain that Fuller's letter granted them a property right to remain in the Academy until its end. Plaintiffs continue that they were entitled to rely on the written directive giving them until the end of the Academy to pass all the physical tests. The 2000 Academy Manual also provided that they were entitled to administrative review. Further, McDonough testified that normally the administrative review is conducted face to face and includes the recruits' participation. Although other recruits were permitted to participate in their reviews, O'Connor's numerous requests for information concerning her review received no response. Therefore, Plaintiffs conclude that their employment as firefighters was terminated without due process.

## IV. THE COURT'S RECOMMENDATION

### A. Counts One and Four: Sex and Age Discrimination.

#### 1. Prima Facie Case.

The Court recommends granting summary judgment on these Counts because Plaintiffs have failed to make out a prima facie case of discrimination. Regardless of whether Plaintiffs' discrimination claims are analyzed under the McDonnell Douglas burden-shifting test or the direct language of the Civil Rights Act of 1991, Plaintiffs must still make out a prima facie case to avoid summary judgment. Hence, Plaintiffs must demonstrate with respect to their sex discrimination claim that they were qualified for the positions they sought, and with respect to their age discrimination claim, that they were meeting their employer's reasonable expectations at the time of termination. These two requirements are effectively the same in the present case, and so there is no need to analyze them separately.

Plaintiffs failed to demonstrate that they were qualified for the positions they sought, because the evidence demonstrates that they failed the required First Quarter Circuit and Flat Chop Practical tests and retests. The 2000 Academy Manual provided that failing two weeks of practical testing, and failing to achieve minimum standards on quarterly exams would result in review to determine whether a recruit should continue in the academy. Plaintiffs' argument that they had the necessary strength and technique, and only had difficulty with speed ignores the problem that these were timed tests. Moreover, the additional practice session offered after the First Quarter Circuit Exam was sufficient to allow the other two female recruits to pass the retest. In addition, there is no evidence indicating any other recruits received superior instruction to what was provided to Plaintiffs. Instead, in response to Ed Tossey's request, Plaintiffs actually

received additional training prior to their Flat Chop Practical retest.

Although Tossey stated that her defective helmet prevented her from completing the First Quarter Circuit Exam in the required time, Wardell's deposition indicates that other recruits were also having difficulties with their helmets, and, nevertheless, succeeded in passing the test. Further, the helmet played no role in the Flat Roof Chop test which Tossey also failed twice. In addition, Tossey's testimony with respect to her back demonstrates that she was not qualified for a firefighter position. The Court recognizes that Tossey passed the initial entrance exam and stated in her deposition that at the start of the Academy, she was not suffering any symptoms from her two previous compression fractures. But she stated that wearing an air tank for hours each day of the Academy aggravated her injuries, and that she has remained in the same condition ever since. Tossey also conceded that she could not perform the work of a firefighter at this time, and her expert stated that a person with the restrictions Tossey described for herself would not be qualified to work as a St. Paul firefighter. Because Plaintiffs cannot demonstrate that they are qualified for the firefighter positions, they have failed to make out a prima facie case of either sex or age discrimination.

Plaintiffs also argue that they had until the end of the Academy to pass all the physical exams, and because they were terminated prematurely it is impossible to conclude that they were unqualified. The Court is not persuaded by this argument. The 2000 Academy Manual states that failing the kind and number of tests Plaintiffs failed would lead to administrative review and a decision over whether a recruit would continue. The word "continue" clearly implies that such a decision would be made prior to the end of the Academy. Further, the terms "weekly," "quarterly," and "mid-term" exams would be meaningless under Plaintiffs' interpretation,

because all of these exams could be completed on the final day of the Academy. In addition, the SPFD had maintained the same practice for years before the 2000 Academy.

In addition, Paro's having been removed in the third week demonstrated that recruits could fail prior to completion of the Academy. The Court recognizes that Paro was ultimately allowed to enter a subsequent Academy. This fact may be relevant to an equal protection analysis, as it potentially involves a similarly situated individual being treated differently from Plaintiffs. But it is not relevant for purposes of making out a prima facie case of sex or age discrimination. The issue before the Court for these Counts is whether Plaintiffs were qualified to continue in the 2000 Academy. The details of Paro's failure simply demonstrate that he, like Plaintiffs, was not. Finally, Cobenais' history at the Academy does not affect the Court's conclusion that Plaintiffs were not qualified for the benefit they sought. Although he was permitted to miss four days of the Academy, he proceeded to make up his mixed exams and did not repeatedly fail physical tests. Thus, once he chose to stay in the 2000 Academy, the SPFD had no basis for concluding that he was unfit and should be terminated.

The Court acknowledges Plaintiffs' concern over the larger context in which all of these events occurred. Although Defendants argue that the dispatchers' promotional preference is a gender neutral issue, its history indicates otherwise. The entire effort to make dispatchers sworn employees of the fire department came about as an effort to increase the low number of female firefighters in the SPFD. Therefore, rather than simply being directed at a general category of employees, much of the resistance to the dispatchers maintaining promotional preference and higher salaries may well have resulted from the realization that, in this case, it was women in particular who were receiving an advantage as firefighter applicants. As a result, it would be

inaccurate to assume that this fight, and whatever animus it produced, did not involve issues of gender.

Further, although the Court acknowledges the frequently restated point that two other female recruits successfully completed the Academy, their experience is a separate issue. Plaintiffs may well have faced additional resentment by transferring into the Academy from their dispatcher positions, because in addition to being women, they were entering the Academy after receiving preferential treatment that had not been given to anyone else. Within this context, the Court approached the record in the present case looking for any genuine issues of material fact for trial. But it has been unable to find any evidence of a connection between this potential gender animus and the decision to terminate Plaintiffs from the Academy. Instead, Plaintiffs received the same opportunities as the other recruits, and occasionally received additional ones. Nevertheless, they were unable to pass the required physical tests and were terminated as unqualified to continue in the Academy. Therefore, Plaintiffs have failed to make out a prima facie case and summary judgment should be granted.

### B. Count Six: Retaliation/Reprisal.

#### 1. Individual Defendants.

The Court recommends granting the individual Defendants' and St. Paul's motions for summary judgment with respect to reprisal/retaliation. As stated earlier, the MHRA does not appear to impose individual liability in any cases other than aiding and abetting. More specifically, the reprisal section of the MHRA states that "[i]t is a reprisal for an employer" to commit various enumerated acts. Federal Courts have repeatedly concluded that supervisors and individuals do not qualify as employers under Title VII, and the court in Waag reached the same

conclusion with respect to the MHRA. Therefore, the reprisal claims fail as a matter of law against the individual Defendants.

Defendants Olding and Cook are also entitled to summary judgment on the merits of the reprisal claims. Cook cannot be said to have "participated in the alleged discrimination" as required by Minn. Stat. § 363.03, subd. 7, and neither he nor Olding played any role in the decision to terminate Plaintiffs. Reprisal occurs when an individual is punished in some way for opposing a practice forbidden by the MHRA. Defendants correctly observe that Plaintiffs made no complaints about the 2000 Academy until after they had been terminated. Therefore, their termination cannot constitute reprisal unless it was the result of some earlier act by which Plaintiffs opposed an allegedly discriminatory act. The two possible acts by which Plaintiffs may have opposed a forbidden practice would be Plaintiffs' protesting the removal of their seniority and promotional preference, and all of the female dispatchers' complaint to the MDHR that the initial exam was discriminatory. Cook did not participate in either of these areas, and, therefore, the reprisal claims fail as applied to him. Olding also played no part in the initial entrance exam. He was involved in the seniority and promotional preference issues, which, as the Court stated earlier, came about originally as an effort to increase the number of women firefighters, and, therefore, could raise the issue of gender discrimination. But neither Olding or Cook played any role in Plaintiff's termination. That decision was made entirely by Fuller. Therefore, there are no genuine issues of material fact with respect to Olding or Cook, and they are both entitled to summary judgment.

Defendant Fuller is also entitled to summary judgment. Although the seniority and promotional pay issues, as well as the discrimination complaints concerning the initial entrance

exam could qualify as opposing a practice forbidden by the MHRA, no evidence has been provided concerning any connection between them and Fuller's decision to terminate Plaintiffs. Therefore, Plaintiffs' only argument is the temporal proximity between their complaint and their termination. Temporal proximity in some cases may be sufficient to make out the final element of a prima facie case of retaliation. See,e.g., Couty v. Dole, 886 F.2d 147, 148 (8th Cir. 1989). In the present case, however, Fuller has offered a legitimate, nondiscriminatory explanation by stating that Plaintiffs were terminated for multiple failures of required physical tests after being provided with an additional opportunity and additional training. While timing is sufficient to make out a prima facie case, the Eighth Circuit has also indicated that in certain circumstances it is insufficient to advance a Plaintiff's case any further. See,e.g., Nelson v. J.C. Penney Co., Inc., 75 F.3d 343, 346 (8th Cir. 1996) (although plaintiff was discharged one month after filing age discrimination claim, there was no evidence that others who filed charges were dismissed or that plaintiff's supervisors ever discussed the filing or ever commented to plaintiff about it).

**2. Defendant St. Paul.**

For the same reason, Defendant St. Paul is also entitled to summary judgment. The Court recognizes that in addition to an MHRA claim for reprisal, St. Paul also faces a retaliation claim under Title VII. But as stated earlier, both state and federal claims for reprisal/retaliation are analyzed under the McDonnell Douglas burden-shifting test. Thus, whether they are referring to having opposed practices forbidden by the MHRA, or, instead, engaging in statutorily protected activity under Title VII, Plaintiffs must make some showing of a causal connection between those events and an adverse employment decision. Because Plaintiffs have failed to demonstrate any connection between their involvement in the seniority and promotional pay issues or their

complaints concerning the initial entrance exam, and the decision to terminate them from the Academy, St. Paul is entitled to summary judgment on both the MHRA claim and the Title VII claims against it.

**C. Count Two: Equal Protection.**

The Court recommends denying Defendant St. Paul's motion with respect to the equal protection claim. Cobenais' cancer diagnosis, as well as his subsequent performance at the 2000 Academy demonstrate that he was not similarly situated to Plaintiffs. Cobenais failed a written repelling exam because he missed the lecture was given one of the days he was gone, and a lifting restriction forced him to delay taking certain physical tests. He subsequently passed the written repelling exam, along with all the other written and practical exams. There is also no evidence that he failed any of these tests initially, requiring retests, or that he received training beyond what was given to the rest of the recruits. As a result, the Court finds there is no genuine issue of material fact resulting from Cobenais having been permitted to miss four days of the Academy and take certain tests out of sequence. See, e.g., Klinger v. Department of Corrections, 31 F.3d 727, 731 (8th Cir.1994) (treatment of dissimilarly situated people in a dissimilar manner does not violate the Equal Protection Clause).

There may, however, be a genuine issue of material fact with respect to Paro and Cobenais both receiving the opportunity to resign from the 2000 Academy and reenlist the following year. This offer was never made to Plaintiffs. St. Paul suggests that it was not necessary to make such an offer to Plaintiffs because resignation at that time for them would have meant the loss of their dispatcher jobs, seniority, and the promotional preference without which they would not have placed high enough to have been hired in the first place. It may be

true that Plaintiffs would have declined such an offer because of its consequences, but that is merely speculation at this point. Moreover, it is inappropriate at the summary judgment stage to conclude that Plaintiffs were not entitled to receive the same option that was given to a similarly situated male recruit simply because they might have turned it down.

In addition, the Court does not find that Paro's veteran status renders him dissimilar for equal protection purposes. As Fuller's letter stated, Minn. Stat. § 197.46 gave Paro the right to request a hearing on the reasonableness of his removal. The Statute did not, however, give Paro the right to resign and be reinstated in the next Academy. Although that strategy was recommended by Robertson, it was within Fuller's discretion to grant or deny Paro's request. Plaintiffs never were advised of such an option, although Hamilton stated that it would likely have been within Fuller's discretion to grant such a request as well. It may well be that if Plaintiffs had sought the advice of a human resources counselor as Paro did, they would have been informed of this option. Further, it is possible that if he received such a request from Plaintiffs, Fuller would also have granted it. But as stated earlier, the need for speculation concerning this issue suggests that there is a genuine issue of material fact and summary judgment is not appropriate.

As a final note, the Court finds there is a genuine issue of material fact concerning whether Plaintiffs received unequal treatment as a result of their sex, but not as a result of their age. Age is not a suspect class for purposes of equal protection analysis, and, therefore, Plaintiffs bear the burden of demonstrating that their treatment was not even rationally related to a legitimate state interest. See, e.g., McGinty, 251 F.3d at 91. Although Plaintiffs have demonstrated that they were not treated equally to Cobenais and Paro, the facts in question are

insufficient to raise a genuine issue under rational basis review with respect to age discrimination.

**D. Count Three: Due Process.**

The Court recommends granting St. Paul's motion with respect to the due process claim. As at-will probationary employees, Plaintiffs did not have a protected property interest in their employment. See Sommers, 245 F.3d at 785. Fuller's letter lists the Academy starting date and adds that an orientation and outline will be provided during the first week. Beyond those facts, the only details of the Academy that it contains are that certain injuries resulting from non-sanctioned activities which prevented a recruit from completing any training evaluation could result in separation from the SPFD. Therefore, a reasonable person in Plaintiffs' position could not have concluded that this letter alone defined the requirements of the Academy.

Instead, the letter refers recruits to the subsequent orientation at which they received the 2000 Academy Manual. As noted earlier, the 2000 Academy Manual states that failing multiple weekly exams or a quarterly exam would result in a review to determine whether a recruit would continue. In addition, St. Paul Civil Service Rule 10.A states that recruits such as Plaintiffs were probationary employees. In order to accept Plaintiffs' argument concerning Fuller's letter, it would be necessary to imagine a scenario in which probationary recruits failed exams and were found unqualified to continue, but, nevertheless were kept on until the completion of the Academy.

When determining whether language in a policy manual, or in this case a letter, can form the basis for a contract claim, or alter at-will employment, if the language is unambiguous it is a question of law, but if it is ambiguous or contradictory, it becomes a question of fact for the jury.

Compare Hunt v. IBM Mid America Employees Fed. Credit Union, 384 N.W.2d 853, 857 (Minn.1986) (in reviewing summary judgment dismissing claim, determination of whether contract for indefinite "for cause" employment was formed is question of law) with Lewis v. Equitable Life Assur. Soc., 389 N.W.2d 876, 883 (Minn.1986) (noting that when terms of contract are unclear, determination of contract formation is for jury, and upholding jury verdict in favor of employee), and Brookshaw v. South St. Paul Feed, Inc., 381 N.W.2d 33, 36 (Minn. Ct. App.1986) (reversing summary judgment because conflicting language in handbook with "disclaimer" created question of fact), review denied (Minn. Apr. 11, 1986).

In the present case, the Court concludes that the language in the manual unambiguously established that recruits were not guaranteed that they would remain at the Academy until completion. Instead, they had the same probationary status as all other first-year SPFD employees.

## V. DEFENDANTS' MOTION TO STRIKE PORTIONS OF PLAINTIFFS' SUBMISSIONS

Defendants move to strike from the record submissions by Plaintiffs in opposition to Defendants' motions for summary judgment on the grounds that they are inadmissible hearsay, not supported by a citation to the record, lack foundation, lack relevance, or were provided through an attorney acting as a witness.

The Court recommends denying Defendants' motion as moot in part and denying it in part. As listed in the discussion section of this Report and Recommendation, the Court is aware that a party opposing summary judgment must set forth facts showing there is a genuine issue of material fact, and that such facts must be substantively admissible even if the actual form of the

information is not. Therefore, with one exception, the Court has not considered the specific facts Defendants list in their motion. The single exception is Defendants' objection to the fact that Paro was permitted to resign from the 2000 Academy. This fact is supported by Paro's own deposition testimony at pages 49-52, and the May 1, 2001 reinstatement letter sent to him from St. Paul, attached as page 12 to Exhibit 1. Therefore, the Court finds no basis for striking this fact.

## VI. PLAINTIFFS' MOTION TO STRIKE PORTIONS OF AFFIDAVITS

Plaintiffs move to strike the paragraphs from the affidavits of Jane Thompson and Kathryn Michalski in which they state that they never experienced different treatment from the other recruits because of their sex, were never subjected to sexual harassment, and never witnessed any behavior they believed to be discriminatory toward women. Plaintiffs state these paragraphs are conclusory, irrelevant, and contain inferences, opinions, and surmise not based upon personal knowledge.

Plaintiffs also move to strike the August 13, 2002 report of Defendants' expert, David Klocek, because the Court has not yet conducted a preliminary assessment of the report under <u>Daubert</u>. In addition, Plaintiffs state the report violates hearsay rules and is conclusory, lacking specific facts.

Finally, Plaintiffs move to strike the paragraphs of Mark Robertson's affidavit concerning: (1) the salaries of the dispatchers who entered the 1994 Academy; (2) the salary for all recruits entering the 2000 Academy; and (3) statement that if Plaintiffs had wanted to be placed in the reinstatement register after they were terminated, Civil Service Rule 23.B would have required that they resign from their dispatcher positions and lose seniority and promotional

preference. Plaintiffs state Defendants previously refused to produce discovery concerning other St. Paul employees that was requested by Plaintiffs based on the Minnesota Data Practices Act. In addition, Plaintiffs state the paragraph concerning the effects of their asking to be reinstated provides a legal conclusion and incorrect interpretation of Rule 23.B

The Court recommends denying Plaintiffs' motion as moot in part and denying it in part. The Court recommends denying Plaintiffs' motion with respect to the Affidavits of Thompson, Michalski, and Robertson. The Court finds nothing improper in the affidavits of Thompson and Michalski. Their statements are relevant, based on personal knowledge, and reach no conclusions beyond those of which a lay person is capable. The Court also finds nothing improper in Robertson's affidavit. Plaintiffs have not provided any evidence that Defendant St. Paul previously improperly refused to provide requested information. In addition, Plaintiffs have simply asserted that Robertson misinterpreted Rule 23.B, but offer no explanation for their assertion.

The Court recommends denying as moot Plaintiffs' motion with respect to Klocek's expert report. The Court has not considered this report.

Based upon the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED that:**

(1) Defendants City of St. Paul, Fuller, and Cook's Motion for Summary Judgment (Doc. Nos. 56 & 59) be **DENIED** as to Count Two concerning gender-based equal protection, **GRANTED** as to Count Two concerning age-based equal protection, and **GRANTED** as to all other Counts;

(2) Defendant Olding's Motion for Summary Judgment (Doc. No. 66) be **GRANTED**;

(3) Defendants City of St. Paul, Fuller, Cook, and Olding's Motion to Strike Portions of Plaintiff's Submissions (Doc. No. 76) be **DENIED IN PART AND DENIED AS MOOT IN PART** consistent with the body of this Report and Recommendation;

(4) Plaintiffs' Motion to Strike Portions of Affidavits (Doc. No. 69-1, 85-1, & 85-2) be **DENIED IN PART AND DENIED AS MOOT IN PART** consistent with the body of this Report and Recommendation.

Dated: July 23, 2003.

Susan Richard Nelson

SUSAN RICHARD NELSON
United States Magistrate Judge

Under D. Minn. LR 72.1(c)(2) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by August 6, 2003, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.